# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### Bankruptcy Judge Elizabeth E. Brown

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BERNARD P. BALCK and | ) | Bankruptcy Case No. 09-30074 EEB |
| LORRAINE C. BALCK, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| DAROL HOFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 10-1005 EEB |
| | ) | |
| BERNARD P. BALCK and | ) | |
| LORRAINE C. BALCK, | ) | |
| | ) | |
| Defendants. | ) | |

---

## ORDER

---

THIS MATTER comes before the Court on the Plaintiff's Complaint, which alleges nondischargeability claims under 11 U.S.C. §§ 523(a)(2) and 523(a)(4). The Complaint concerns two lines of credit used by Debtors to renovate an investment property in Cheyenne, Wyoming owned by the parties. After the project was completed and the lines of credit paid off, Plaintiff Darol Hoffman ("Hoffman") alleges Debtors drew down the lines of credit without Hoffman's authorization and used the funds for personal and unrelated business expenses. Hoffman then sued Debtors in state court and obtained a judgment against them for the unauthorized amounts drawn on the lines of credit. Following trial on the matter, the Court finds and concludes that Debtors' obligation to Hoffman is nondischargeable.

## I. Background

Debtors Bernard "Bud" and Lorraine Balck are married and filed a joint petition under Chapter 13 on September 24, 2009. Bud Balck is currently semi-retired and does occasional excavation work. His primary sources of income are a pension and social security. Lorraine Balck is currently employed as a prep cook. Over the past two decades, Debtors have attempted, without much success, to set up various investment opportunities, including real estate developments in Mexico and the United States, and recruited investors for those investments. Hoffman was one such investor. Debtors first met Hoffman in approximately 1995, when he

invested in one of Debtors' ventures called Wyco Tech. Wyco Tech ultimately failed, but Debtors stayed in touch with Hoffman about projects on which they were working.

In 1999, Debtors found a partially completed residential property at 10258 Choke Cherry Road in Cheyenne, Wyoming ("Choke Cherry"). Debtors recruited Hoffman to invest funds in order to purchase Choke Cherry and complete construction, with the intent of eventually selling the house at a profit. Debtors and Hoffman also purchased an adjacent vacant lot, as well as options on other nearby vacant lots, and hoped to continue building homes in the neighborhood. To facilitate the project, Debtors and Hoffman formed Wilderness Properties, Inc., a Wyoming corporation ("WPI"), in 1999. The parties agree that the initial purpose of WPI was to finish the Choke Cherry property. Hoffman and Bud Balck were each 50% owners of WPI's stock, with the understanding that Hoffman would be supplying the funds for the project and the Debtors would be investing their "sweat equity" to complete the home. Hoffman signed a special power of attorney pursuant to which Hoffman gave Bud authority to act on his behalf and execute documents "necessary or incidental to effecting and closing the sale of [the Choke Cherry property]." Hoffman's Ex. 6.

Although Hoffman provided the funding for WPI, the finances of the company were handled primarily by the Debtors, who lived rent-free at Choke Cherry while making renovations. The Debtors established a WPI checking account, which they used to pay expenses. In addition, Bud (with Hoffman's permission) used his special power of attorney to open two lines of credit, both with a $50,000 limit. The home equity line of credit, or "HELOC" was secured by the Choke Cherry property and the prime line of credit, or "PLOC" was personally guaranteed by Hoffman. There was no written document that defined or limited the use of the LOCs, but the parties agree that the original purpose of the accounts was to fund the business of WPI–which at that time was to finish and sell Choke Cherry. Although both Hoffman's and Bud's names were on the LOC accounts, the account statements were mailed only to Debtors at the Choke Cherry address. As such, Hoffman did not review the statements and entrusted Debtors with the discretion to use the LOC funds as they saw fit. Hoffman testified he regularly sent $5,000-$7,000 per month to the Debtors so that they could make the monthly payments on the LOCs and the mortgage, and cover other miscellaneous expenses. Lorraine testified that she handled the accounting for WPI and paid the bills. Because Lorraine was not a signatory on any of the bank accounts, she frequently signed Bud's name on checks.[1]

Around the same time the parties formed WPI, Debtors were trying to start a real estate development project in Mexico and formed Wilderness Properties de Mexico, S.A. de C.V., a Mexican corporation ("WPM"). Debtors recruited Hoffman for that project as well, and he testified that he invested a small, unspecified amount of money and took one trip with Debtors to Mexico to view the property in 1999. The project stalled out shortly thereafter when Debtors

---

[1]Debtors' trial testimony that Lorraine signed Bud's name to checks was at odds with the a signed affidavit that Bud filed with this Court in support of a motion to dismiss. In that affidavit, Bud indicated that he signed all checks written on the LOCs.

learned the option they had on the Mexico property was not valid because it was not given by the true owner of the property. Several years later, in 2003, WPM was able to purchase a 20-year option on the property from the rightful owners, and Debtors continued their efforts to develop the property.[2] By that time, however, Hoffman contends he was no longer investing in either WPI or WPM.

By early 2003, Hoffman testified that he had become disenchanted with Debtors and wanted to stop investing with them. Hoffman testified that he called Lorraine and told her he wanted out. Hoffman then sought to take ownership of Choke Cherry. On April 22, 2003, Bud signed a quitclaim deed which transferred all of his and WPI's interest in Choke Cherry to Hoffman individually. Hoffman had an appraisal done on Choke Cherry and shortly thereafter, refinanced the outstanding debt and used part of the funds to pay off both LOCs. Hoffman believed construction on Choke Cherry to be complete and his investment finished and, as such, there was no need to keep the LOCs open. By February 2004, both HELOC and the PLOC had $0 balances and Hoffman thought these accounts were closed. Hoffman also believed Debtors had found another investor to finance WPM, including the purchase of the real estate option in 2003. Thus, by the end of 2003, Hoffman testified that he had ceased to invest in either WPI or WPM. Despite ending his investment, Hoffman testified that he remained friendly with the Debtors after 2003, and continued receiving updates from Loraine on WPM and additional projects she was working on through WPI. Hoffman, however, did not believe he was investing in any of those projects or that the LOCs (which he believed were closed) would be used for them. Hoffman also allowed the Debtors to continue living at Choke Cherry rent-free, but testified that he did not have knowledge of, authorize, or pay for any further renovations.

At trial, the Debtors disputed Hoffman's version of events. Debtors contend Hoffman requested that Choke Cherry be transferred to him in 2003 because the Debtors had recently received a second notice of tax deficiency, in an ongoing dispute they had with the IRS about back taxes. The purpose of transferring Choke Cherry, according to the Debtors, was to protect it from any lien the IRS might assert. Debtors testified that Hoffman never terminated his relationship with them, never withdrew from WPI or WPM, and that he continued to have an active involvement in the investment projects on which they were working. By 2004, those projects had expanded to include a real estate development in Greeley, Colorado, and a bar called Borders in Wyoming. As with WPI and WPM, Debtors created separate legal entities for these projects, namely Wilderness Properties, LLC (a Nevada LLC) and Borders, LLC (a Wyoming LLC). Lorraine testified that she believed Hoffman was an investor in the Greeley project and Borders, but there are no documents to support this belief.[3] It is also contradicted by

---

[2]Lorraine Balck testified that WPM purchased the option in 2000. However, the promotional materials for WPM indicate the option was purchased sometime after March 2003, when WPM's attorney discovered the previous option was not legitimate. *See* Debtors' Ex. R.

[3]Debtors claim that their Exhibit BBB shows the ownership shares for the Greeley project. A review of that document, however, indicates that it relates to the Mexico project, with

Lorraine's prior deposition testimony that Hoffman was not an investor in Borders. *See* Hoffman Ex. 68, p.62. Debtors also claim they continued to make renovations on Choke Cherry after 2003. There is no evidence, however, that Hoffman sent any funds to Debtors after 2003.

Despite Hoffman's belief to the contrary, the LOCs were not closed in early 2004 when he paid them off. Rather, the bank kept them open and continued sending statements to the Debtors. In late 2004, after the LOCs had laid dormant for a period of over nine months, the Debtors once again began to make draws on the LOCs. During a 13-month period between October 10, 2004 and November 12, 2005, Debtors proceeded to withdraw $52,086 from the PLOC and $54,403 from the HELOC. Since Hoffman was no longer sending them funds, Debtors also had to make the minimum payments on the LOCs during this period. In fact, the account statements show that Debtors used a draw on the HELOC to make a least one monthly payment on the PLOC. Hoffman testified that, at the time, he had no knowledge of the draws or that the LOC accounts were even open.

Lorraine testified that the $106,489 they withdrew from the LOCs in the 2004-2005 period was used for business purposes, including finishing Choke Cherry, and funding the Mexico, Greeley and Borders projects. From the evidence presented, however, it is difficult to trace exactly how Debtors spent the funds. A majority of the convenience checks and cash withdrawals from the LOCs simply went into WPI's checking account, with brief memo line notation such as "attorney fees" or "loan." Neither Debtor could testify with specificity as to how they spent the funds, and they contend that they no longer have the records showing where the money went, other than a small number of checks written on the WPI checking account during the relevant period. Several of the HELOC convenience checks were made out to credit card companies. Debtors claim these were personal credit cards on which they charged business travel expenses. However, Debtors could not substantiate that claim with credit card bills or receipts. Similarly, some of the HELOC withdrawals went directly to a bank account set up for Borders, but Debtors could not account for exactly how those funds were spent.

Regardless of how Debtors spent the funds, Hoffman claims he did not authorize Debtors to make any of the 2004-2005 draws. Hoffman argues the LOCs were set up solely for him to fund WPI's completion of Choke Cherry. Since he ended his investment in 2003 and WPI transferred ownership of Choke Cherry back to him after construction was completed, Hoffman contends Debtors use of the LOCs after the 2003 pay-off was unauthorized and fraudulent. Hoffman admits he did not specifically instruct Debtors to discontinue using the LOCs, but contends such a conversation was unnecessary since he thought the accounts were closed. In November 2005, Debtors missed a monthly payment on the LOCs, and the bank mailed a notice of nonpayment to Hoffman. Hoffman then called the bank and discovered that both LOCs had been maxed out. In 2006, Hoffman evicted Debtors from Choke Cherry. Hoffman eventually sold Choke Cherry to a third party for $350,000. Hoffman testified that there was a deficit of

---

expense listings for "Mexican housing" and "Marina Dredging" and sales projections for "Luxury Beachfront Properties."

approximately $8,900 after payment of all outstanding debt on Choke Cherry, which he had to pay out of pocket to complete the sale. In addition, he had to pay off the outstanding balance on the PLOC account out of his own funds.

Hoffman sued Debtors in Laramie County District Court in Wyoming for breach of fiduciary duty, breach of an implied fiduciary duty and conversion.[4] Hoffman obtained a state court judgment against Debtors in the amount of $106,489.82, plus statutory interest ("State Court Judgment").[5] In the proceeding, Hoffman seeks a determination that the obligation represented by the State Court Judgment is nondischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(4).

## II. Dischargeability under § 523(a)(4)

Section 523(a)(4) provides that a discharge under Chapter 13 does not discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Hoffman argues the State Court Judgment is a debt for embezzlement. The Tenth Circuit has defined the elements of an embezzlement claim under § 523(a)(4) as "'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988) (quoting *Great Am. Ins. Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983)). "This definition breaks down into five elements: "1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent." *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002). For purposes of § 523(a)(4), embezzlement requires a showing of "'fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir.1986) (quoting *American Family Insurance Group v. Gumieny (In re Gumieny)*, 8 B.R. 602, 605 (Bankr. E.D. Wis. 1981)). Hoffman has the burden to establish each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Exceptions to discharge under the Bankruptcy Code are to be strictly construed in favor of the debtor. *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1301 (10th Cir. 1996).

---

[4]This list of claims is derived from Hoffman's motion for summary judgment in the state court action. *See* Hoffman's Ex. 27. Hoffman did not provide this Court with a copy of his state court complaint and the State Court Judgment does not specify which claims the state court granted summary judgment on.

[5]The State Court Judgment is a one-page order granting Hoffman summary judgment, with no factual findings or legal conclusions. Hoffman previously requested that this Court grant him summary judgment on his § 523(a)(2) and § 523(a)(4) claims based on the collateral estoppel effect of the State Court Judgment. This Court denied that motion, finding that Hoffman had failed to establish that the elements of either § 523 claim were addressed or decided by the State Court.

### A.  Entrustment

The first element of an embezzlement claim, entrustment, does not appear to be in dispute.  Hoffman agreed to Bud setting up the LOC accounts in his and Bud's names.  Hoffman testified that he entrusted Debtors with the discretion to use funds drawn on the LOCs to fund WPI's renovation of Choke Cherry.  Thus, Debtors originally obtained access to the PLOC and HELOC in a lawful manner.[6]

### B.  Property of Another

Embezzlement for purposes of § 523(a)(4) only exists where the property in question was owned by another.  *Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*, 404 B.R. 244, 272 (Bankr. E.D. Mich. 2009).  "A debtor cannot embezzle his own property."  *Zamora v. Jacobs (In re Jacobs)*, 403 B.R. 565, 575 (Bankr. N.D. Ill. 2009).  In this case, the property at issue is the $106,489 drawn on the LOCs between October 2004 and November 2005.  Although both Hoffman's and Bud's names were on the LOC accounts, both Debtors testified that the parties' understanding was that Hoffman was contributing the cash to run WPI, and that Debtors lacked the ability to do so.  Hoffman used the LOCs as a convenient way to contribute that money.  The parties understood that Hoffman would be repaying the LOCs, since Debtors lacked the income to do so.  In fact, Hoffman did end up repaying all amounts drawn on the LOCs, including the $106,489 drawn by Debtors in the 2004-2005 period.  As such, the Court concludes that the $106,489 was "property of another" for purposes of § 523(a)(4).

### C.  Misappropriation

To establish misappropriation, Hoffman must demonstrate that the Debtors used the monies drawn from the LOCs "for a purpose other than that for which it was entrusted."  *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002).  Because the parties' business arrangement was largely informal and based on oral agreements, there was little direct evidence, other than the parties' testimony, as to the purpose of the LOCs.  That testimony was, for the

---

[6]In closing arguments, Hoffman's counsel also argued that a claim of larceny might be applicable.  The main difference between larceny and embezzlement is that with embezzlement, the debtor initially acquires the property lawfully, whereas larceny requires that the funds originally come into the debtor's hands unlawfully.  *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004).  Hoffman contends he severed his investment relationship with Debtors in 2003 when he paid off the accounts.  As discussed more fully below, the Court agrees that the investment relationship severed in 2003.  However, the bank failed to close the LOC accounts in 2003 and Bud's name remained on them.  Thus, technically, Bud still had lawful access to the accounts after 2003 and embezzlement is the more applicable claim.  Even if Debtors did not have legal access to the LOCs after 2003 and larceny were the applicable claim, this Court's ultimate conclusion of nondischareability under § 523(a)(4) would not change.

most part, highly contested.  On certain key points, however, the parties were in agreement.
Neither party disputes that, at the time they were opened in 1999, the LOCs' purpose was to
allow Hoffman to fund the business of WPI.  Further, neither party disputes that in 1999, the
business purpose of WPI was to finish Choke Cherry and sell it.  In essence, the parties agree
that the purpose of the LOCs, when Hoffman originally entrusted Debtors with use of those
accounts, was to permit Hoffman to fund completion of Choke Cherry.  This fact is supported by
circumstantial evidence in the form of the special power of attorney which Bud used to open the
LOCs.  *See Goodmar, Inc. v. Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky.
2004) ("Both the intent and the actual misappropriation necessary to prove embezzlement may
be shown by circumstantial evidence.").  Both Hoffman and Lorraine testified that they
understood the power of attorney to be expressly limited to Choke Cherry.[7]

Whether the purpose of the LOCs changed over time was highly contested.  Hoffman
testified that the purpose never changed–the LOCs were solely a method by which he funded
completion of Choke Cherry.  When Hoffman stopped investing in WPI and took the property
back in 2003 after its completion, the purpose the LOCs served ended.  That is why he paid off
the LOCs and (he thought) closed the accounts.  Debtors, on the other hand, testified that the
business of WPI changed over time, with Hoffman's consent, to include Mexico, Greeley and
Borders.  Debtors also testified that Hoffman never ended his investment in WPI.  Since
Hoffman continued to invest in WPI and the LOCs purpose was to fund WPI's business, Debtors
argue their use of the LOCs in 2004-2005 was authorized and not a misappropriation.  Debtors
further contend that they continued to work on Choke Cherry after 2003, and that use of the
LOCs for that purpose was authorized.

Given this conflicting testimony, the issue turns primarily on witness credibility.  In
assessing credibility, the Court may consider the "carriage, behavior, bearing, manner, and
appearance of a witness-in short, his demeanor . . . ."  *Dyer v. MacDougall*, 201 F.2d 265, 268-
69 (2nd Cir. 1952).  However, "[c]redibility involve[s] more than demeanor. It apprehends the
over-all evaluation of testimony in the light of its rationality or internal consistency and the
manner in which it hangs together with other evidence." *Government of Virgin Islands v.
Gereau*, 523 F.2d 140, 146 n. 12 (3d Cir. 1975) (internal citations omitted).  "A trial court may
refuse to accept the testimony of a witness, even though it is not directly contradicted by other
evidence, where the witness is interested in the outcome of the case; where his demeanor while
testifying gives rise to doubts of his sincerity; where his evidence is inherently improbable; or

---

[7]At trial, Bud testified that he used the power of attorney to open the LOCs, but not to his
understanding of the scope of the document.  A review of the terms of the power of attorney
indicate that it could be interpreted as conferring powers to deal with real estate beyond Choke
Cherry.  For example, the power of attorney appears to confer on Bud the power to buy or
"otherwise acquire" real estate on behalf of Hoffman, to sell "any or all real estate in which
[Hoffman] now ha[s] or may hereafter acquire," and to manage any real estate owned by
Hoffman.  *See* Hoffman Ex. 6.  However, no party raised this argument and Lorraine and
Hoffman testified to a narrower interpretation.  Accordingly, this Court will not address it.

where omissions and inconsistencies in his testimony engender doubts as to his veracity."
*Zimmer v. Acheson*, 191 F.2d 209, 212 (10th Cir. 1951).

Having observed the demeanor and attitudes of both Debtors and Hoffman, and considering the other circumstantial evidence presented, the Court finds the testimony of Hoffman to be credible. Hoffman's testimony that the sole purpose of the LOCs was to allow him to fund Choke Cherry and that such purpose ended in 2003 is supported by his actions in retaking ownership of the property and paying down the LOCs to $0.[8]  The real estate appraisal obtained by Hoffman in May 2003 indicates construction was complete and the home saleable.[9] *See* Debtors' Ex. P  The Court finds it believable that Hoffman took action to, and believed that, the LOC accounts closed in 2003, in accordance with his desire to stop investing in WPI. The evidence further indicates that Hoffman stopped sending funds to Debtors at that time, and specifically stopped sending monthly payments for the LOCs.  This further corroborates Hoffman's testimony that his investment with Debtors ended.  Once Hoffman's investment ended and the LOCs were zeroed out, any further use of the LOCs by Debtors was unauthorized and a misappropriation.  This includes further renovations the Debtors made to Choke Cherry, which Hoffman had no knowledge of and did not authorize.

In contrast, the Debtors' testimony on this topic was less than credible.  Debtors' demeanor was frequently defensive, combative, and at odds with prior affidavits and deposition testimony given by them.  Both Debtors repeatedly testified that Lorraine discussed "everything" with Hoffman.  But Lorraine's version of  "everything" did not include telling Hoffman that Debtors were spending LOC funds in 2004-2005, and Lorraine admits she never got specific approval from Hoffman on any of the monies she drew from the LOCs during that period. Indeed the account records show, rather than using funds from Hoffman to make the monthly payments on the LOC accounts, as was the case pre-2003, Debtors were forced to make those payments themselves.  Debtors, who live on a fixed income, obviously lacked the funds to do so and used draws on one LOC account to pay on the other.  *See* Hoffman's Ex. 11.  Debtors cannot explain why Hoffman, if he were still investing in WPI and still authorizing use of the LOCs, would stop making the monthly payments.  The more likely explanation is that Debtors made the payments in order to keep Hoffman from finding out about the draws.

The Court also finds dubious the Debtors' contention that, rather than terminating his investment in 2003, Hoffman had expanded it by 2004 to include Mexico, Greeley and Borders. Hoffman admits he remained friendly with Debtors post-2003 and talked with Lorraine about

---

[8]Although Hoffman admits he did not resign as an officer of WPI or return his WPI stock in 2003, this fact does not detract from the credibility of Hoffman's testimony.  The parties' relationship was highly informal, so it is not surprising that Hoffman did not take the formal step of removing himself as a director or shareholder.  In any event, Hoffman testified that WPI never issued any stock certificates, which would have made their surrender impossible.

[9]It is unclear why Hoffman did not list the home for sale in 2003.

8

Debtors' projects.  But Lorraine providing updates does not equate to investing.  The Court also finds credible Hoffman's testimony that he specifically called Lorraine in early 2003 and told her he was ending his investment and, in fact, Hoffman did stop sending funds to Debtors on a regular basis at that time.  Viewed in that context, Lorraine's communication with Hoffman seems more of an attempt to keep Hoffman interested, in hopes he might change his mind about investing.

Debtors offered promotional materials for WPM that list Hoffman as an investor, as well as Hoffman's telephone conversation with Mr. Gronski, the land surveyor on the Mexico project, as proof of Hoffman's continued involvement in the Mexico project.  But Hoffman does not deny that he initially invested in WPM in 1999 and hoped the Mexico project would succeed so that he might get a return on that initial investment.  Hoffman also testified that he ended any further investment in WPM in 2003, and believed Debtors had secured another investor, Mr. Bill Pendleton, to fund WPM after 2003.  This is corroborated by Bud's testimony that Mr. Pendleton--not Hoffman--paid $50,000 for the 20-year option on the Mexico land.  Hoffman also credibly testified that he did not remember receiving any of the promotional materials Debtors produced after 2003, and thus had no knowledge of the representations Debtors were making to others concerning his continued involvement.  In any event, none of this circumstantial evidence demonstrates that Hoffman agreed to Debtors using the LOCs to fund the Mexico project post-2003, let alone Greeley or Borders.  Merely characterizing WPM as part of WPI's business does not mean Debtors were authorized to use the LOCs for that project.  Hoffman ended his investment in WPI in 2003 and the purpose of the LOCs was satisfied.  Any use of the LOCs by Debtors for *any* project after that point was unauthorized.

Debtors also argue that they were authorized to continue using the LOCs after 2003 for a lawsuit concerning the vacant lot next door to Choke Cherry, which was owned by WPI.  In 2003, Mr. Jim Leeling brought suit against Debtors, Hoffman and WPI, and asserted an interest in that vacant lot.  Debtors point to several checks Lorraine wrote on WPI's checking account to attorneys who represented Debtors, Hoffman and WPI in that suit.  During the course of the lawsuit, Lorraine sold the vacant lot for roughly $40,000.  The state court in the Leeling lawsuit ordered that $16,000 of the sales proceeds be deposited in the court's registry to cover any judgment that might enter.  *See* Hoffman's Ex. 69.  Hoffman testified that he spoke to Lorraine about the sale proceeds and she indicated that she would put them in a separate account, rather than the court registry.  Lorraine now admits that she did neither, but rather deposited all of sale proceeds into WPI's checking account.  Two years later, in 2005, the parties negotiated a settlement in which Debtors, Hoffman and WPI agreed to pay Leeling $9,000.  Hoffman testified that he instructed Lorraine to pay the $9,000, thinking she would pay it out of the $40,000 sale proceeds which she claimed to have put in a separate account.  In fact, Lorraine paid the $9,000 out of the HELOC account.  Again, the Court finds Hoffman's testimony on this issue to be more credible.  Lorraine was required by a court order to deposit a portion of the sale proceeds into the court registry and failed to do so.  Instead she deposited them in WPI's checking account to use at her own discretion.  It was reasonable for Hoffman to believe that Debtors would use the lot proceeds, none of which Hoffman ever received, to pay for both the attorneys' fees and the

settlement.  There is no evidence, other than Lorraine's testimony, that Hoffman ever authorized Debtors to use the LOCs to pay either expense.

### D.  Fraudulent Intent

The final element Hoffman must demonstrate is that Debtors misappropriated the funds with fraudulent intent.  *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002).  For purposes of § 523(a)(4), Hoffman must show "'fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986) (quoting *American Family Insurance Group v. Gumieny (In re Gumieny)*, 8 B.R. 602, 605 (Bankr. E.D. Wis. 1981)).  Since fraudulent intent can rarely be shown by direct evidence, Hoffman may utilize circumstantial evidence.  *See Goodmar, Inc. v. Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky. 2004).  Central to an analysis of intent is the Court's assessment of Debtors' demeanor and credibility.  *See Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786 (10th Cir. BAP 1998) ("A finding regarding fraudulent intent, therefore, will be determined on a case-by-case basis, with the ... demeanor and credibility of the witness playing a very large role.").

As discussed above, the Court found Debtors to be less than credible.  Specifically, the Court does not find credible Debtors' testimony that they believed they were authorized to use the LOCs after 2003.  Hoffman credibly testified that he told Lorraine he was ending his investment and believed he closed the LOC accounts.  At the very least, Debtors were aware that Hoffman had paid off the LOCs, and had stopped sending funds to them in 2003.  Yet Debtors chose to make significant draws on the accounts, some as large as $20,000 at one time, and maxed out the accounts within a relatively short time period.  At the same time, it is clear that Debtors were desperate to locate funds for their quickly expanding list of development projects.  Although Debtors kept Hoffman appraised of the status of their projects, Debtors did not tell Hoffman they started to make draws the LOCs in 2004 and did not ask him to send funds to make the monthly payments, as he had in the past. Rather, Debtors took pains to make the monthly payments themselves so as to keep the accounts out of default.  Unfortunately for Debtors, they were unable to maintain the ruse and fell behind on payments.  Based on the circumstantial evidence and an assessment of Debtors' credibility, the Court concludes that Debtors misappropriated funds from the LOC accounts with fraudulent intent.

## III.  Conclusion

For the reasons stated above, the Court concludes that Hoffman has demonstrated all elements of embezzlement under § 523(a)(4).  Hoffman requests that the full amount of the State Court Judgment, $106,489.82, be held nondischargeable.  Debtors make various arguments as to why the State Court calculated damages incorrectly.  This Court, however, declines Debtors' invitation to second guess the amount of the State Court Judgment.  A prior state court judgment is *res judicata* as to the total amount of debt, and precludes this Court from redetermining the amount of Hoffman's damages.  *In re Griego*, 64 F.3d 580, 584-85 (10th Cir. 1995).  This is true even though the state court judgment was entered on summary judgment or default judgment.

10

*Id.* at 584.  The record does indicate, however, that Hoffman has collected a portion of the State Court Judgment.  Hoffman admits that he obtained a prejudgment attachment on $6,464 in proceeds of an auction of Debtors' personal property from Choke Cherry.  The state court then released that amount to Hoffman after the State Court Judgment entered.  Hoffman concedes that this amount must be credited against the State Court Judgment.  Accordingly, the Court orders that $100,025.82, plus applicable post-judgment interest, and less any amounts collected postpetition, is nondischargeable.[10]

DATED this 28th day of September, 2011.

BY THE COURT:

_____
Elizabeth E. Brown
United States Bankruptcy Judge

---

[10]Because the Court finds the entire amount of the State Court Judgment to be nondischargeable pursuant to § 523(a)(4), the Court need not address Hoffman's arguments under § 523(a)(2).

11